UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.:  04-20004-CIV-ALTONAGA/BANDSTRA

THAIS CARDOSO ALMEIDA,

     Plaintiff,

v.

AMAZON.COM, INC., a Delaware
corporation,

     Defendant.



## MOTION FOR SUMMARY JUDGMENT
## AND MEMORANDUM OF LAW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, defendant Amazon.com, Inc. ("Amazon.com"), by and through its undersigned counsel, files its Motion for Summary Judgment and supporting Memorandum of Law with respect to plaintiff Thais Cardoso Almeida's claims for misappropriation of her likeness under: (1) Florida's "privacy" statute, Fla. St. § 540.08; (2) Florida's Civil Theft Act, Fla. St. § 772.11; and (3) Florida common law.

### MOTION FOR SUMMARY JUDGMENT

Plaintiff seeks to expand the scope of Florida's privacy laws into the realm of the absurd. Plaintiff asserts that she is entitled to recover gross revenues derived from the retail sale of a book of 52 photographs, which includes only two 1991 photographs of plaintiff. Plaintiff alleges that inclusion of these two photos in the book exceeded the scope of an admittedly valid consent. Liability cannot extend to an Internet retailer that had no role whatsoever in authoring or publishing the book and no knowledge of any dispute over the scope of the consent. Plaintiff's claims should be dismissed.

## I. STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 7.5, Southern District of Florida, the following is a concise statement of material facts to which there is no genuine issue to be tried.

**A.**   *Anjos Proibidos*

In 1991, when Almeida was ten years old, her mother gave written consent to have semi-nude photographs taken of her by photographer Fabio Cabral ("Cabral").  See Declaration of David R. Goodnight ("Goodnight Decl.") at Exh. A, Response 2.[1]  That consent included express permission to display the photographs of plaintiff at an exhibition and to publish the photographs in a related book.  See Complaint at Exh. A, B.  The photos were publicly displayed for several days at the exhibition.  See Goodnight Decl. at Exh. A, Response 2.   Cabral's book, *Anjos Proibidos,* was published in 1991 by Itamarati Gráfica E Editora Ltda and included Almeida's photo.  See Complaint at ¶ 16.

Almeida admits that the consent covered publication of her photo in a book by Cabral. See Goodnight Decl. at Exh. A Response 2.  Although she claims that the title of the book (*Anjos Proibidos*) was different from the title of the exhibition (*18 Meninas com Menos de 18 Anos*), Almeida still admits that the book was "exhibited on two nights in 1991, in Brazil, at such gallery, in such a manner as was otherwise authorized."  Id. at Responses 2, 3.

In 2000, a second edition of *Anjos Proibidos* was published by Ophelia Editions.  See Goodnight Decl. at Exh. B No. 1; Exh. C.  Fabio Cabral was again listed as the author of the book.  Almeida admits that it was simply a second edition of the original book.  Id. at Exh. C. She claims that she is "upset about the use of [her] image in and on the cover of the 2000 edition

---

[1]   Amazon.com has filed a Notice of Filing Discovery Responses and Declarations in Support of Motion for Summary Judgment.  Citations that are outside the pleadings are to documents attached to the Declaration of David R. Goodnight, the Declaration of Sarah Spillman, or the Declaration of Melissa Kirmayer.

of *Anjos Proibidos* because she claims it was unauthorized and uncompensated." Id. at Ex. B. No. 1.

Almeida alleges that in 2002 she learned that the Ophelia Editions edition of *Anjos Proibidos* was being sold by Amazon.com; that her mother ordered the book from Amazon.com; and that it was different from the original *Anjos Proibidos* book sold in conjunction with Cabral's exhibition in 1991. See Complaint at ¶¶ 43-49. She claims that she did not give her consent to use her image in the Ophelia Editions edition of the book, and that Amazon.com's sale of the book is somehow improper under theories of privacy and civil theft. Id. at ¶¶ 122-144.

Amazon.com has no relationship with the author, editor, or publisher of either edition of *Anjos Proibidos*. See Declaration of Melissa Kirmayer ("Kirmayer Decl.") at ¶¶ 7, 8. Amazon.com had no involvement or knowledge of how the photos were obtained for the 2000 edition of *Anjos Proibidos* or how the book came to be republished. Id. The photos in both books are attributed to Cabral and the 2000 edition was edited by Lawrence A. Stanley. See Goodnight Decl. at Exh. C.

On March 6, 2003, Almeida contacted Amazon.com and alleged that it was using her image on its website without her consent. See Goodnight Decl. at Exh. D. She did not ask that Amazon.com stop selling her book. Id. Rather, she simply demanded payment for the sale of the book, stating that "in such circumstances, the person aggrieved is entitled to recover an amount equivalent to a reasonable royalty and other damages." Id. Amazon.com immediately removed Almeida's image from its website and stopped selling *Anjos Proibidos*. Id. at Exh. E.

In December 2003, Almeida filed suit against Amazon.com in state court for violation of her statutory and common law privacy rights, and for civil theft. Amazon.com removed the case

to this court.  Almeida has not named as defendants any of the people responsible for the publication of the 1991 or 2000 editions of *Anjos Proibidos*, *i.e.*, Ophelia Editions, Itamarati Gráfica, Stanley, or Cabral.

**B.     Amazon.com's Limited Role as Retailer.**

Amazon.com is one of the world's largest Internet booksellers.  <u>See</u> Kirmayer Decl. at ¶ 2.

A typical corner bookstore determines which books to offer for sale, how to stock inventory, and where to display each particular book, and is limited by the amount of space available to the bookseller.  Amazon.com's selection of products, by contrast, is available entirely online via the World Wide Web.  <u>Id.</u>

Each book offered for sale from Amazon.com retail catalog has a "detail page" on the Amazon.com website.  <u>Id.</u> at ¶ 3.  A detail page may include an image of the book (usually the book's cover), some text describing the book (such as its author, publisher, a summary, and sometimes professional reviews), and product specification information (such as price, ISBN number, number of pages, etc.).  <u>Id.</u>  The information in the detail pages is in electronic form, and most of this information is created and submitted to Amazon.com electronically by third-party distributors.  <u>Id.</u>

Amazon.com works with numerous distributors and receives thousands of detail page listings every day.  <u>Id.</u> at ¶ 4.  Detail page listings are typically sent in groups.  <u>Id.</u>  In other words, any one distributor's transmission to Amazon.com might contain several hundred individual book listings.  <u>Id.</u>  Amazon.com's systems automatically convert the detail page listing information submitted by third parties into the detail pages that appear on its website (there is no manual review by Amazon.com employees), and new detail pages are added every

day through this automated process. Id. at ¶¶ 4, 5.

Amazon.com, of course, provides an enormous selection of books, in part due to the automated way in which new items appear on Amazon.com's website for sale. As a rule, Amazon.com has nothing to do with the preparation of the books it offers for sale on its website. Id. at ¶ 6. Amazon.com does not write or edit the contents of the books it offers for sale on its website. Id.

In addition to selling books through its own website, Amazon.com contracts with "Associates" who host their own websites and provide links to books and other products sold on Amazon.com's website. See Declaration of Sarah Spillman at ¶ 2. These Associates are entirely separate and independent legal entities. Id.

Associate websites range from other Internet businesses to private websites run by individuals. Id. A website that signs up to be an Associate can allow visitors to that website to buy products from Amazon.com by creating text or graphical links to the Amazon.com website (including, at their option, using the image of the product and/or the Amazon.com logo). Id. at at Exh. A. For example, a cooking website that is an Amazon.com Associate can recommend cookbooks to its visitors, and provide a link through which those cookbooks can be purchased from the Amazon.com website. In return, the Associate receives referral fees for purchases made by people who come to the Amazon.com website via the link on the Associate website. Id.

Associates can sign up online by clicking through the standard Associate Operating Agreement. Id. at ¶ 3. The agreement specifically provides that Associates are solely responsible for the development, operation, and maintenance of their own websites and the content placed on their websites. Id. at Exh. A., ¶ 10 ("Responsibility For Your Site").

Since 1995, over a million Associates have signed up with Amazon.com. Id. at ¶ 4.

While some Associates can elect to receive content from Amazon.com by creating a specific link, Amazon.com does not and cannot control what Associates place on their own websites. Id. Plaintiffs have not named any Associates as defendants in their suit.

## II. MEMORANDUM OF LAW

### A.      Summary Judgment Standard.

Pursuant to Fed. R. Civ. P. 56(b), a party against whom a claim is asserted may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor. Pursuant to Fed. R. Civ. P. 56(c), a judgment shall be entered if the pleadings, depositions, and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

### B.      Plaintiff's "Privacy" Claims Are Not Cognizable Against An Innocent Retailer.

Plaintiff seeks to recover Amazon.com's profits from the sale of *Anjos Proibidos*. See, e.g., Compl. at ¶ 126, 142 (seeking gross revenues derived from sales of *Anjos Proibidos*); id. at ¶ 131 (alleged "use" of photographs deprived plaintiff of right to "benefit therefrom").

Plaintiff's claims are quintessential "right of publicity" claims. At common law, the right of publicity "is the legal label denominating the law's recognition of the property right inherent in the commercial value of a person's identity." 1 J THOMAS MCCARTHY, RIGHTS OF PUBLICITY & PRIVACY § 6:3 (2d Ed. 2004) (hereinafter, "McCarthy"); see Loft v. Fuller, 408 So.2d 619, 622 (4th DCA 1981) (Florida recognizes right of publicity as a subspecies of common law right of privacy); RESTATEMENT (SECOND) TORTS § 652C (1977).

Fla. St. § 540.08 codifies the common law right of publicity, see Loft, 408 So.2d at 622, and provides that:

> No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph,

> or other likeness of any natural person without the express written or oral consent
> to such use given by: (a) such person; or (b) any such other person, firm or
> corporation authorized in writing by such person to license the commercial use of
> her or his name or likeness.

Actions under Fla. St. § 540.08 and the common law right of publicity are analyzed identically.

Lane v. MRA Holdings, LLC, 242 F. Supp. 2d 1205, 1220 (M.D. Fla. 2002).

Amazon.com cannot be held liable on the facts alleged in this case, both as a matter of law and sound policy. Imposing liability on an internet retailer would create impracticable and undue burdens. Amazon.com sells millions of books. *Anjos Proibidos* contains 52 photographs. To avoid liability, under plaintiff's theory, every bookseller and distributor in the chain of commerce would be required to individually verify that each photograph was obtained with valid consent. A retailer simply cannot be expected to verify the intellectual property rights associated with every photo and sentence of every product it sells. If plaintiff's theory of liability were accepted, every bookseller that has ever sold even a single copy of *Anjos Proibidos* would be exposed to an award of damages. There is no law to support such a drastic extension of liability.

In Brinkley v. Casablancas, 438 N.Y.S.2d 1004 (App. Div. 1981), a fashion model brought suit against her modeling agency and its president, a poster distributor ("Galaxy"), and two retailers ("Spencer" and "Oomi") alleging unauthorized publication, distribution and sale of posters bearing her image. The model asserted causes of action pursuant to N.Y. Civil Rights Law § 51, which, like Fla. St. § 540.08, prohibits unauthorized use of a person's "name, portrait, or picture" for the "purposes of trade." Id. at 1007. Neither retailer had knowledge of any dispute over distribution of the poster and neither sought the model's consent directly. Id. at 1006.

The court dismissed the damages claims against the retailers:

Liability is sought to be imposed upon Spencer solely upon the basis of its purchase from Galaxy of a quantity of plaintiff's posters for resale. The purchase was in all respects a standard commercial transaction and Spencer, at the time, had no knowledge of the lack of consent. Hence, no action for exemplary damages lies. Nor does plaintiff have a claim against Spencer for compensatory damages since Spencer has desisted from selling any of the posters. *Moreover, we do not believe that the merchandiser, which is not a publisher, and which sells a product exploiting the name, portrait or picture of a person, without either knowledge that such exploitation is unauthorized or even notice that would prompt reasonable inquiry, has "used" that person's name, portrait or picture within the meaning of sections 50 and 51 of the Civil Rights Law so as to subject itself to liability for compensatory damages. To hold otherwise would subject such merchandiser to hazards over which it has no control, and impose upon it a burden disproportionate to the interest to be protected.*

Id. at 1014. In addition, the court held that the second retailer was not liable *notwithstanding its having sold copies of the unauthorized posters*:

While Oomi has sold some of the posters, plaintiff fails to show that its purchase of them was other than a standard commercial transaction or that it was aware of her lack of consent. Thus, notwithstanding Oomi's default, plaintiff is not entitled to partial summary judgment on liability . . . .

Id.

Similarly, in defamation actions, it is well-settled that that "where a defendant has no 'actual part in composing or publishing,' he cannot be held liable 'without disregarding the settled rule of law by which no man is bound for the tortious act of another over whom he has not a master's power of control.'" Cerasini v. Sony Corp., 991 F. Supp. 343, 352 (S.D.N.Y. 1998) (dismissing defamation claim against defendants that allegedly republished defamatory material) (quotation omitted); see RESTATEMENT (SECOND) TORTS § 581 ("one who only delivers or transmits defamatory material published by a third person is subject to liability if, but only if, he knows or has reason to know of the defamatory character"). Thus, in Dworkin v. Hustler Magazine, Inc., 634 F. Supp. 727 (D. Wyo. 1986), the court dismissed defamation claims against retailers who sold magazine containing allegedly defamatory material. The rationale for the rule is that "it is unreasonable to hold that a local distributor of newspapers should be required to

check the contents of each issue for libelous matter." Bowerman v. Detroit Free Press, 283 N.W. 642, 645 (Mich. 1939).

Here, as in Brinkley, Amazon.com acquired copies of *Anjos Proibidos* through a standard commercial transaction with a distributor.   Amazon.com had no involvement whatsoever in photographing plaintiff or authoring, editing, or publishing *Anjos Proibidos*.   Nor did Amazon.com have any knowledge of any dispute over intellectual property rights.   Once Amazon.com learned of plaintiff's allegations, it immediately removed *Anjos Proibidos* from its catalog and ceased selling the book.

Plaintiff has received the only relief to which she is entitled; Amazon.com stopped selling *Anjos Proibidos* immediately upon learning of plaintiff's allegations.

**C.    The Photographs In Question were Not Used For "Commercial Purposes" Within the Meaning of Florida Law.**

Plaintiff's claims also fail because Amazon.com did not use plaintiff's image for trade, commercial, or advertising purposes.   A person's name or likeness is used for trade, commercial or advertising purposes only when it is "'used solely to attract attention to a work that is not related to the identified person.'"  Lane, 242 F. Supp. 2d at 1213 (quoting RESTATEMENT (THIRD) UNFAIR COMPETITION § 47); see Valentine v. CBS, Inc., 698 F.2d 430, 433 (11th Cir. 1983). Thus, incidental use of a person's name or likeness to promote a work in which that person appears is not prohibited.  Lane, 242 F. Supp. 2d at 1213.

In Lane, a young woman consented to being videotaped while exposing herself.   The footage was later included in a video entitled *Girls Gone Wild* and related advertisements.   While she had initially consented to being videotaped, the plaintiff did not consent to use of the video footage for public display or commercial purposes.  Id. at 1210.

In dismissing the plaintiff's claims under Fla. St. § 540.08 and the common law right of

publicity, the court held

> it is irrefutable that the *Girls Gone Wild* video is an expressive work created
> solely for entertainment purposes. ***Similarly, it is also irrefutable that while
> Lane's image and likeness were used to sell copies of Girls Gone Wild, her
> image and likeness were never associated with a product or service unrelated to
> that work***. Indeed, in both the video and its commercial advertisements, Lane is
> never shown endorsing or promoting a product, but rather, as part of an
> expressive work in which she voluntarily participated. Consequently, in
> accordance with Section 47 of the Restatement, the use of Lane's image or
> likeness in *Girls Gone Wild*, and in the marketing of that video cannot give rise to
> liability.

Id. at 1213 (emphasis added).

In this case, plaintiff acknowledges that she initially consented to be photographed. Now,
however, she claims that her initial consent does not extend to inclusion of her photographs in
another edition (the 2000 edition) of *Anjos Proibidos* or the incidental use of the photographs in
connection with sales of the book. Amazon.com did not use the photographs in question to
promote any product or service other than *Anjos Proibidos*. The book was simply sold over the
internet. Under Florida law, such use is not actionable. See Loft, 408 So.2d at 623 (use of a
person's image "is harmful not simply because it is included in a publication that is sold for
profit, but rather because of the way it associates the [person] with something else").

**D.     Plaintiff's Claims Are Barred By The Initial Consent To Appear In Cabral's Book.**

Plaintiff admits that she was photographed and that the photographs were displayed and
published with express consent over nearly 13 years ago. Under the first-sale doctrine, once the
holder of an intellectual property right "consents to the sale of particular copies . . . of his work,
he may not thereafter exercise the distribution right with respect to such copies." Allison v.
Vintage Sports Plaques, 136 F.3d 1443, 1447 (11th Cir. 1998). "Any other rule would extend
the monopoly created by the intellectual property right so far as to permit control by the right-
holder over disposition of lawfully obtained tangible personal property." Id. at 1447-48. The

first-sale doctrine thus prevents intellectual property rights from creating undue restraints on alienation and trade. Id. at 1448 (citation omitted).

The first-sale doctrine, which has its origins in copyright law, applies with equal force to actions invoking the common law right of publicity. See id. (applying first-sale doctrine to limit right of publicity under Alabama law). It is also codified in Fla. St. §540.08:

> (3) The provisions of this section **shall not apply to**:
> * * *
> (b) The use of such name, portrait, photograph, or other likeness *in connection with the resale or other distribution of literary, musical, or artistic productions or other articles of merchandise or property where such person has consented to the use of her or his name, portrait, photograph, or likeness on or in connection with the initial sale or distribution thereof.*

Id. (emphasis added).

In Allison, a sports figure licensed the use of his image on sports trading cards. A retailer purchased the trading cards, mounted the cards on plaques, and marketed the plaques as collectibles. The retailer was not party to the original license agreement and never paid a royalty to the sports figure. The federal district court dismissed the case, based on the first-sale doctrine, and the Eleventh Circuit affirmed. The reasoning was straightforward – because he had consented to the initial publication, the plaintiff was barred from complaining of subsequent distribution. See id. at 1449.

Plaintiff does not dispute that the photos in the 2000 edition of *Anjos Proibidos* are the same photos that were taken by Cabral under the original consent agreement. Nor does she dispute that at least one of the images – the cover image – is the very same photo that was used with consent in the original edition of *Anjos Proibidos*. See Complaint at ¶ 19. Thus, Amazon.com's retail sale of *Anjos Proibidos* falls within first-sale exception to Florida's statutory privacy law.

E.      **Plaintiff's Civil Theft Claim Is Frivolous**

To establish a claim for civil theft, Plaintiff would have to establish that Amazon.com *knowingly* procured her image with the *specific intent* to deprive her of the right to her image or a benefit of her image, or to appropriate her image to its own use. See Fla. St. §812.014(1). Plaintiff must not only show that Amazon.com knowingly obtained her image without permission, but that it did so with *felonious intent to commit theft*. Ames v. Provident Life & Accident Ins. Co., 942 F. Supp. 551, 560 (S.D. Fla. 1994). Moreover, Plaintiff bears the burden of proving these elements by *clear and convincing evidence*. *Small Business Admin. v. Echevarria,* 864 F. Supp. 1254, 1264 (S.D.Fla.1994).

There is no evidence – let alone clear and convincing evidence – that Amazon.com harbored felonious intent to commit theft with respect the two images of Plaintiff appearing in *Anjos Proibidos*. Indeed, Amazon.com was wholly unaware that Almeida believed her image was taken without her consent until Almeida herself contacted Amazon.com. When Almeida told Amazon.com that she did not consent to the use of her photo in *Anjos Proibidos* and asked Amazon.com to stop selling the book, Amazon.com, while under no legal obligation to do so, immediately stopped selling the book.

Almeida also contends that Amazon.com should be held liable for the actions of Associate websites. Almeida points to no evidence or legal authority that would allow a court to find Amazon.com responsible for the separate and independent actions of third party independent contractors, and there is none. See Pappas v. Smart Health USA, 861 So.2d 84, (Fla. Dist. Ct. App. 2003) (retailer has no liability for independent actions of supplier).

The Amazon.com Associates Operating Agreement provides that Associates are responsible for the development and maintenance of their own websites, and that they are

responsible for ensuring that materials posted on their sites do not infringe on third party rights, including third party privacy rights.

Further, Plaintiff's image from the cover of *Anjos Proibidos* is widely available to other third party websites on the Internet today. The image of the book's cover was not created by Amazon.com and the exact same electronic listing is used by other large Internet book retailers. See Goodnight Decl. at Exh. F;  see also www.zooscape.com; www.buchwelt.de. The image of the book's cover is as accessible to others today as it was to Amazon.com when the book was sold on Amazon.com's site. Almeida makes no showing otherwise.

**F.      Plaintiff Is Not Entitled To The Damages She Seeks**

Plaintiff contends that Amazon.com is liable for "total gross revenues" attributable to

the cross selling effect of "hits" from internet browsers on products of the same genre and other genres marketed and sold by AMAZON: even if a customer decided not to buy "Anjos Proibidos," he or she might purchase other products as a result of having been enticed into AMAZON's virtual online store.

See Complaint at ¶ 102.[2]

Plaintiff cannot seriously contend that other sales were caused by the alleged act of infringement. There is simply no support for this measure of damages in law or reason.

---

[2]  Plaintiff also claims that she is entitled to damages for emotional distress. Her own allegations belie this claim. Plaintiff claims that the publication of her photo *in the original edition* of *Anjos Proibidos* in 1991 "caused a national scandal, caused [her] to be ostracized at school and helped wreck the relationship between [her] parents." See Goodnight Decl. at Exh. B, No. 1. She says that she has "suffered from a depressive illness, on and off, since then." Id. Despite that, in 1997, Almeida's parents consented to *another* photo of Almeida – taken by the *same photographer* – and published in a national magazine in a "then-and-now" article on  the subjects of *Anjos Proibidos*. Id. Almeida claims that the magazine article also published the photo of her used in *Anjos Proibidos* without her consent. Id. In short, she admits that she has "consulted several psychiatrists and psychologists for treatment for emotional distress and depression which [she] believe[s] was contributed to in significant part by the *publication* of the old and new versions of *Anjos Proibidos*." Id. at No. 4. Nowhere does Almeida attribute any emotional distress to any action by Amazon.com in selling the book.

Obviously, this case was filed – and the colorful complaint drafted – with the hope that Amazon.com had sold hundreds of thousands of these books.  In fact, the number is so small (3,163) that there is no reason for this case to continue.  See Brinkley, 438 N.Y.S.2d at 1015 (case should be dismissed against retailers because the sales of allegedly infringing poster were *de minimis*) (Kupferman, J., concurring).  Plaintiff's counsel knows this and so now is reaching for "other sales" as a measure of damages.

But to recover for proceeds from the sale of "other" items sold at the same time as *Anjos Proibidos* was sold or viewed, Almeida would need to substantiate a clear and compelling causal relationship between the viewing of the *Anjos Proibidos* detail page and the purchase of another book, say, *The Joy of Cooking*.  This is simply impossible.

Under Florida law, a plaintiff must establish a causal nexus between the act complained of and the damages alleged.  Stahl v. Metro. Dade County, 438 So.2d 14, 17 (Fla. Dist. Ct. App. 1983); Dep't of Transp. v. Anglin, 502 So.2d 896, 899 (Fla. 1987) ("Florida courts . . . have for good reason been most reluctant to attach tort liability for results which, although caused-in-fact by the defendant's negligent act or omission, seem to the judicial mind highly unusual, extraordinary, bizarre, or, stated differently, seem beyond the scope of any fair assessment of the danger created by the defendant's negligence.") (citation omitted).

To show causation, Plaintiff would have to prove that the customers would not have bought the additional item but for viewing the *Anjos Proibidos* detail page.  No such evidence exists or could be sufficient to rise above an exercise in pure speculation.

Almeida's claim that Amazon.com could be held liable for the proceeds from sales that were referred to its site by Associate websites that at some point displayed the *Anjos Proibidos* image is even worse.  The act of linking to the Amazon.com site from another site is an

intervening act of free will.  There is no logical basis to conclude that such action was caused by viewing the *Anjos Proibidos* detail page.

In short, even if Plaintiff could establish liability, she is simply not entitled to any of the damages she seeks.

### III.   CONCLUSION

For all the foregoing reasons, Amazon.com's Motion for Summary Judgment should be granted.

Respectfully submitted,

STOEL RIVES LLP
Attorneys for Amazon.com, Inc.
600 University Street, Suite 3600
Seattle, Washington 98101
 (206) 624-0900; (206) 386-7500 (Fax)

By:   David R. Goodnight, admitted pro hac vice
      Vanessa Soriano Power, admitted pro hac vice

RUDEN, McCLOSKY, SMITH,
SCHUSTER & RUSSELL, P.A.
Attorneys for Defendant
P.O. Box 1900
Ft. Lauderdale, Florida 33302
(954) 527-2427; (954) 764-4027 (Fax)

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Defendant's Motion

for Summary Judgment and Memorandum of Law has been furnished by Hand Delivery this 7*th*

day of June, 2004 to:  Hendrik G. Milne, Esquire, Aballi Milne Kalil & Escagedo, P.A., 2250

SunTrust International Center, One Southeast Third Avenue, Miami, Florida 33131.

Respectfully submitted,

RUDEN, McCLOSKY, SMITH, SCHUSTER &
RUSSELL, P.A.
*Attorneys for Defendant Amazon.com, Inc.*
P.O. Box 1900
(200 East Broward Boulevard)
Ft. Lauderdale, FL  33302
Telephone  (954) 527-2427
Facsimile  (954) 333-4027

Beth-Ann E. Krimsky
Florida Bar No. 968412
Beth-Ann.Krimsky@ruden.com

STOEL RIVES, LLP
*Attorneys for Defendant Amazon.com, Inc.*
David R. Goodnight, Esq., admitted pro hac vice
Vanessa S. Power, Esq., admitted pro hac vice
600 University Street, Suite 3600
Seattle, WA  98101
Telephone:  (206) 624-0900
Facsimile:  (206) 386-7500
drgoodnight@stoel.com
vspower@stoel.com