UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-20004-CIV-COOKE/McALILEY

THAIS CARDOSO ALMEIDA,

        Plaintiff,

v.

AMAZON.COM, INC.,
a Delaware Corporation

        Defendant,

_____/

**NIGHT BOX
FILED

JUL 20 2004

CLARENCE MADDOX
CLERK, USDC/SDFL/MIA**

## PLAINTIFF'S MEMORANDUM IN RESPONSE ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## - AND –
## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AS TO LIABILITY AND MEMORANDUM IN SUPPORT
## - AND -
## STATEMENT OF FACTS
## AS TO WHICH THERE IS NO GENUINE ISSUE TO BE TRIED ON
## BOTH PARTIES' MOTIONS FOR SUMMARY JUDGMENT

Plaintiff, Thais Cardoso Almeida, ("Thais" or "Thais Cardoso"), pursuant to Fed.R.Civ.P. 56 and S.D.Fla.L.R. 7.5(c), files this Memorandum in Response on Defendant's Motion for Summary Judgment and Motion for Summary Judgment as to Liability and Memorandum in Support and Statement of Facts as to which there is No Genuine Issue to be Tried, on Both Parties' Motions for Summary Judgment, and says:

### Introduction

The central issue in this case is not, as Amazon attempts to characterize it, Amazon's liability for the sale and distribution of a second edition of "Anjos Proibidos," a book of photographs which contains Ms. Cardoso's unauthorized image inside and on the cover.



The central issue in this case, pleaded clearly and in detail in the complaint, concerns Amazon's liability for the worldwide broadcast of Ms. Cardoso's image and name on its websites and on the websites of its Associates, without her consent, in order to attract potential purchasers browsing the internet to visit Amazon's websites and purchase this book as well as other products of all kinds.

Accepting this distinction, much of Amazon's argument is automatically negated. Moreover, the record evidence establishes liability on Amazon on all counts. We submit herewith the Declarations of Stephen Hall, Wanda Cardoso, Thais Cardoso and the undersigned, and Amazon's Answers and Objections to Interrogatories. We further make reference to the Declarations of Melissa Kirmayer and Sarah Spillman, filed by Amazon.

## STATEMENT OF FACTS

### Amazon

1.      Amazon operates websites around the world under the domain names amazon.com (U.S.), amazon.co.uk (U.K.), www.amazon.de, (Germany), www.amazon.fr, (France), www.amazon.co.jp, (Japan) and www.amazon.ca, (Canada). [Complaint, para. 32; Answer para 32]. It is one of the foremost internet retailers in the world, particularly of books, but also of CDs, DVDs and other products. [Complaint, para 34, 41; Answer paras 34, 41; Milne Declaration, Composite Exhibit "C" paras. 1 – 6, 32 - 42].

### Amazon's Associates

2.      Amazon has over a million "Associates," worldwide, to whom it pays commissions for referring buyers through a process of "deep-linking" from product advertisements on their websites to the product advertisements on Amazon's own pages. [Hall Declaration, para. 10, 11; Spillman Declaration, para. 4 and Exhibit "A"].

3.      Although, the Associates pledge in their contracts that they are nominally separate and independent from Amazon and retain artistic control over what images and text to use, in actual fact, AMAZON exercises total, *ultimate* control over what its Associates show on their websites.  This is because under its standard form contract, Amazon dictates the ambit of what its Associates may and may not show.  [Spillman Declaration, Exhibit "A," generally].

4.      Amazon supplies certain core artwork and text to the Associates and controls its modification.  [Spillman Declaration, Exhibit "A," Sections 2, 8 and 9].  The Associate promises to delete any Content that is no longer displayed on the Amazon.com site.   [Spillman Declaration, Exhibit "A," Section 2, para. 13].  Amazon retains the right, in its sole discretion, to "crawl" and "monitor" the Associate sites, *inter alia* to determine if the site is offering unavailable product.  [Section 2, para. 12]; to withhold commission payments, [Section 4, para. 4]; and even to revoke Associate status, completely, at any time. [Section 1: "Unsuitable sites include those that . . . violate intellectual property rights;" "By participating in the Program you agree that you will not engage in any such activities;" "If we accept your application and your site is thereafter determined (in our sole discretion) to be unsuitable for the Program, we may terminate this Agreement."  Section 11, "we may terminate this Agreement at any time, with or without cause."].

5.      If Amazon, under its Associate contract, directed any Associate to cease using any particular image because it was being used without legal authority, Amazon could effectively enforce that direction by withholding commissions or revoking Associate status.  [Necessary Inference].

6.      If Amazon failed to issue a direction to cease using an image that it knew was illegal, and kept paying commissions for buyers funneled in to its websites by use of that illegal

image, Amazon would be encouraging and profiting from that continued illegal use by its sales agent. [Necessary inference].

## Use of the Image

7.      In the course of 2002, the Plaintiff, and her mother realized that Amazon was advertising a book containing a collection of photographs of semi-naked girls under the age of eighteen under the name product description **"Anjos Proibidos ('Forbidden Angels')"** - for sale on its various international websites.  The price of the book was U.S. $60.00.  [Wanda Cardoso Declaration, para. 22 - 26].

8.      On the "product detail page" on each of its websites, Amazon and its Associates' websites featured the cover image from the book.  This was a semi-naked photograph of THAIS CARDOSO as a girl of ten under the caption: **"Anjos Proibidos ('Forbidden Angels')."**  The image was accompanied by different versions of text, all explaining or inferring that that the images contained in this book had been the subject of a criminal prosecution in Brazil for pornography, which had eventually ended in acquittal.  The text message included a purported "quote" from Thais, as follows:  **"Thais, age 10**.  'I really like Fabio.  He's super-cool.  I never felt any shame making the photos . . . .'"  [Hall Declaration, Composite Exhibit "A"].

9.      This image had originally been taken in 1991 under a license restricted to two-night's exhibition and about 500 volumes, granted by Thais's mother to a fashion photographer named Fabio Cabral.  About 200 of the original books had been sold.  That license expired after the second night of the exhibition.  [Wanda Cardoso Declaration, para. 2 - 12].

10.     Neither Ophelia Editions, the publisher of the new – very different – book [Compare Wanda Cardoso Declaration Exhibits "C" and "D"] nor the original photographer, Fabio Cabral, nor Amazon, nor its Associates, had any legal right to use the image in any way.

The Plaintiff, a Florida resident, is the only person who has the right to license the use of this image. [Wanda Cardoso Declaration, para. 2 - 18; Thais Cardoso Declaration, para. 10 -11].

11.     Amazon removed the image and the product from its own websites after March 11, 2003, after the Plaintiff's attorneys demanded that it do so, but many of Amazon's Associates continued thereafter to use the image and to refer customers to AMAZON via their continuing use of the image.  [Milne Declaration, para. 2, 3; Hall Declaration, Composite Exhibit "A"].

12.     Amazon has offered no evidence that it made any attempt to prevent that continuing use by its Associates, which it had the right to do and could have done.  [See paras. 3 – 6, *supra*].

## The Image as Advertising

13.     All product detail pages on the websites of all web retailers of commercial products, such as Amazon and its Associates constitute advertising. The whole purpose of such pages is to promote the sales of particular products, promote the sales of other products in the genre, promote the sales of other products outside the genre but offered by the web-retailer, and to build the brand identity of the web-retailer. All images used on such pages are intended to achieve those marketing ends. [Hall Declaration, paras. 20 - 22].

## The Importance of the "Cover Shot"

14.     In selling any book or publication, the cover-shot is important.  It is selected to grab the attention of the customer.  In selling any book of photographic images, the cover shot is of increased importance, since the contents are themselves photographic.  A common approach to marketing such products, therefore, is to select the most compelling image from the contents and display it on the cover. [Hall Declaration, paras. 23 - 24].

15.     In selling books on the internet, the intending customer is not, typically, able to browse the contents before making the buying decision.  In such circumstances the image selected for display is of the highest importance and therefore "has to say it all." The relatively high, $60.00 item price for Anjos Proibidos enhanced the need for a powerful cover image as a marketing tool and to justify the purchase. [Hall Declaration, paras. 25 - 27].

16.     As a sophisticated internet retailer, Amazon understands that its publishers have already gone through a selection process for the best cover image and that Amazon's own most cost-effective marketing approach need consist only of adopting the publisher's choice by scanning in the image and displaying it on its various websites. [Hall Declaration, paras. 28 - 29].

17.     The image chosen for the cover of Anjos Proibidos, and therefore the image chosen by Amazon and its Associates for the worldwide advertising of the book via the internet, was the image of Thais, at issue in this lawsuit. [Hall Declaration, para. 30].

### The Anjos Proibidos Marketing Pitch

18.     Anjos Proibidos forms part of a genre of books, DVDs and videos sold by Amazon and promoted by Amazon and its Affiliates that is fairly tightly defined.  At one end is the buyer who is interested in photography of the human form, whose focus is on the artistic quality of the image.  At the other end is the buyer who is more interested in the subject of the image, erotic images of naked or semi-naked little girls. [Hall Declaration, para. 31].

19.     The combination of image and text constituting the marketing "pitch" regarding Anjos Proibidos on the Amazon and Associate websites is, overall, directed at the buyer motivated by his interest in erotic images of naked or semi-naked little girls. [Hall Declaration, para. 32 - 36].

6

## The Value of the Image of Thais to Amazon

20.     Amazon received over $180,000.00 in regard to the sale of copies of Anjos Proibidos. [Amazon's Answer to Interrogatory No. 1]. The advertising image of Thais Cardoso played a causal role in those sales. [Hall Declaration, para. 37].

21.     However, the image was not just used to advertise the product itself. The image was also used to assist in selling (a) other products such as books, DVDs and videotapes in the same genre; (b) other, wholly unrelated products; and (c) to promote AMAZON's brand. [Hall Declaration, para. 38 - 46].

22.     This relationship between use of the image and sales can be clearly seen by examining the commission arrangement between Amazon and its Associates. Such websites will declare that they operate "in Association with Amazon.com." When an intending purchaser clicks on an image of an item at the Associate site, he is "deep-linked" (i.e. linked, by-passing the Amazon home page) directly to the Amazon detail page for that product. If the deep-link results in sale of the product, the Associate receives a commission. More importantly, regardless of whether that customer buys the particular product, Amazon pays the Associate a commission on any sale that results within a set time of the customer having entered the Amazon site. [Spillman Declaration, Exhibit "A," Section 4, 5; Hall Declaration, paras. 49 - 50].

23.     By this fact Amazon recognizes that (a) there is a causal relationship between attracting the customer through the display of an image advertising one product at an Associate's website and the eventual sale of other product at Amazon and (b) Amazon regards the causal value as being at least equal to the commission paid. [Hall Declaration, para. 52].

## Failure to Follow the Industry Standard of Care

24.     Intellectual property rights are at the core of web-marketing.  Such rights include photographic and text copyrights and the right to exploit the names and likenesses of natural persons in photographic and text advertising messages. [Hall Declaration, para. 53].

25.     All sophisticated web retailers know that under the laws of many if not all of the jurisdictions to which they market products via the use of photographic images, they cannot legally do so without permission from the relevant owners of the intellectual property rights bound up in that image.  [Hall Declaration, para. 54].

26.     Such rights are jealously guarded,  [Hall Declaration, para. 53] and Amazon is no stranger to such disputes.  For example, as a Plaintiff, it has sought to enforce its own trademark rights in this Court and as a Defendant, has been accused of displaying hundreds of images on its websites for which it had no consent, in the federal court in its hometown of Seattle.  [Milne Declaration, paras. 6, 7; Exhibits "C" and "D"].

27.     It is the standard in web marketing for website operators to make sure that they have legally binding licenses to use such images before publishing them on the web. [Hall Declaration, para.55].

28.     Amazon "typically" receives such images in large electronic "feeds" of hundreds or thousands of images which are automatically loaded onto Amazon's websites and it "relies entirely on publishers and distributors to ensure that the products they offer for sale through Amazon.com do not violate any intellectual property or other third-party rights."  [Kirmayer Declaration, paras. 4 – 5].  Amazon therefore admits that it does nothing to assure itself that it has the right to use *any* image.

29.    In short, Amazon contends that under its business model its procedure is to publish all images it is given, in complete, blind ignorance as to whether it has or does not have any legal right to use them. [Necessary Inference]. This is a breach of the ordinary standard of care in web advertising. [Hall Declaration, para. 55, 64].

30.    To comply with the industry standard would be simple and inexpensive for Amazon to do – even maintaining its current business model. The necessary consents can be scanned and supplied electronically; which would add nothing to Amazon's own cost of doing business; would place only the most minimal additional burden on the majority of its suppliers of product (who, if they had such consent, should have appropriate documentation on file) and would eliminate all wrongful use such as occurred here. [Hall Declaration, para. 66].

### Heightened Need for Caution due to the Genre

31.    Amazon markets a wide range of controversial photographic works featuring naked images of young children and erotic videos and DVDs that explore the awakening sexuality of young teens. Amazon's advertising for Anjos Proibidos was included in this genre. [Hall Declaration, para.56, Composite Exhibit "A"]. Amazon is well aware of the controversial nature of the genre. [Milne Declaration, para. 5; Composite Exhibit "B"].

32.    Amazon's text advertisements on its websites and on the websites of its Associates note that the photographic material contained in the book had been the subject of a criminal prosecution of the photographer and the publisher of an earlier version of the book on charges of pornography under the criminal laws of Brazil – a country which is not known for being sexual conservative. [Hall Declaration, para. 57].

33.    From the contents of its own advertising, Amazon knew that the re-publication of these images was likely to be highly controversial and that whatever the outcome of a single

9

prosecution under Brazilian child pornography laws of a decade ago, was still highly likely to be the subject of a debate in many of the jurisdictions where it proposed to sell the book, as to whether it was "art" or "kiddie porn." [Hall Declaration, para. 58].

34.     From the content of its own advertising, Amazon knew that the images in Anjos Proibidos had become notorious as a result of the Brazilian prosecution and national debate and that any image used as the worldwide promotional shot on the Amazon websites would have particular commercial value.  These factors enhanced the need to make sure that Amazon had a legally binding license to use the image. [Hall Declaration, para. 59].

35.     It was well below the operative standard of care in web advertising, and indeed reckless, for Amazon to use this image in this sensitive product area without first securing satisfactory evidence that it had the legal right to do so. [Hall Declaration, para. 66].

### Further Heightened Need for Caution due to the Publisher

36.     This new version of Anjos Proibidos appears to have been a bootleg version, was certainly published entirely without the authority of the Plaintiff, the only person who had the legal right to license the use of this image, and apparently even without the knowledge of the photographer. [Wanda Cardoso Declaration, paras. 30 – 41].

37.     Amazon has refused to supply the name of the distributor from which it received this image and text.  [Milne Declaration, Exhibit "E"]. We are presently therefore unable to comment on the reputation of that entity or the degree of caution with which the electronic feeds in question should have been treated.

38.     Had Amazon made any inquiry as to the reputation of the publisher, Ophelia Editions and its owner, Lawrence A. Stanley, it would have been greatly alarmed: the publicly available information revealed that Lawrence A. Stanley was a convicted pedophile on the run

from the law for sex offenses with small children and that Ophelia Editions and his other businesses specialized in child pornography.  [Milne Declaration, Composite Exhibit "A"].

39.     The fact that Amazon made no prior check on *this* publisher whatsoever, further heightens the recklessness of its behavior.  [Necessary inference].

### Consequences to Thais

40.     The original *Anjos Proibidos* caused a criminal prosecution and a national scandal, caused Thais to be ostracized at school and helped wreck the relationship between her parents.  She has suffered from a depressive illness, on and off, since then.  She is upset about the use of her image in and on the cover of the Ophelia Editions edition *of Anjos Proibidos*. However, what she is much more upset about is the unauthorized use and publication of her image on the internet by Amazon and its Amazon Associates and having become sort of "poster child" for pedophiles everywhere.  [Thais Cardoso Declaration paras. 3, 15 - 17].

### MOTION AND MEMORANDUM

The issues on the cross-motions for summary judgment are so interwoven that they are dealt with in a combined memorandum, as follows:

### Count I – Fla. Stat. § 540.08

Fla. Stat. § 540.08 provides that:

> No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purposes the name, portrait, photograph, or other likeness of any natural person without the express written or oral consent to such use given by; (a) such person; or (b) any such other person, firm or corporation authorized in writing by such person to license the commercial use of his name or likeness.

The statute squarely applies to the facts of this case.  As has been said, "Section 540.08, by prohibiting the use of one's name or likeness for trade, commercial or advertising purposes, is

designed to prevent the unauthorized use of a name [or likeness] to directly promote the product or service of the publisher." *Loft v. Fuller*, 408 So. 2d 619, 622-23 (Fla. 4th DCA 1981). In context, the "publisher" here is the publisher of the web advertisement, Amazon. Amazon used the photographic image of Thais, identifying her by name, as the focal point of its internet advertisements promoting its products and its service. That the image and text on the web product detail pages constitute advertisements is clear. Hall Declaration, para. 20 - 22. The case law recognizes that the cover model on a photographic work has peculiar value, even in a conventional book-shop transaction.

> Covers are designed to attract the consumer's attention. The consumer looks first at the subject on the cover, then to the cover lines, and then, in the case of a sex-oriented magazine, to the center or centerfold if one exists. The decision to buy or not is then made as an emotional response, usually in a matter of seconds.

*Sygma Photo News, Inc. v. High Society Magazine, Inc.*, 778 F.2d 89, 95 (2d Cir. 1985).

A cover shot has peculiar and enhanced value in a cyber-transaction where the customer cannot browse the book before buying and that one shot "has to say it all." Hall Declaration para. 25. The image of Thais was the focal point of Amazon's web advertising of this product and the direct cause of more than $180,000 in direct receipts and an as yet unknown amount more as a result of "click throughs" on her image at Associate websites. [Hall Declaration paras. 20 – 30; 37 - 52]. The use of an image or likeness in web site advertising falls within the statute. *Gritzke v. M.R.A. Holdings, LLC*, 2003 U.S. Dist. LEXIS 9307, *4 (N.D. Fla. March 16, 2003). In *Gritzke*, "defendant used plaintiff's photograph, with her breasts exposed, on the videotape package and in widely disseminated advertisements, as well as on defendant's web site, all without plaintiff's permission," and the Northern District of Florida held that since the plaintiff "squarely alleged that defendant published her photograph in Florida for commercial and advertising purposes – specifically on the package of defendant's videotape and *in*

12

*advertisements therefore* – and that defendant did so without her permission[,] *this states a claim under § 540.08*." *Gritzke*, 2003 U.S. Dist. LEXIS at *1, *4 (emphasis added). Similarly in *Bosley v. WildWetT.com*, 310 F.Supp. 2d 914, 922-25 (N.D. Ohio 2004), where the U.S. Court for the Northern District of Ohio considered Fla. Stat. § 540.08, it concluded that web advertising fell within the statute.

It is also clear that there was no consent to Amazon's use of the image in the Ophelia Editions version of *Anjos Proibidos*. Thais' mother gave consent to Fabio Cabral to photograph Thais when she was ten, in 1991. The release was limited to two nights and 500 volumes, of which about 200 were sold on those two nights. After those two nights in 1991, no one had a right to use those photographs for commercial purposes without Thais' parents' consent during her minority and without Thais' own consent thereafter. Cabral asked for such consent in around 1993 and was refused it. [Wanda Cardoso Declaration para. 16-8]. No one has asked for permission thereafter: had they done so, it would have been refused. It is no defense to assert that the image in question was the subject of a prior, expired license. *Sun International Bahamas Ltd. v. Wagner*, 758 So. 2d 1190, 1191 (Fla. 3d DCA 2000).

Cabral has denied having had anything to do with this book. He has been asked for an affidavit on the point, which he has promised but not yet supplied. Amazon supplies no evidence that Cabral was involved with the production of the new book. Amazon supplies no evidence that Ophelia Editions had the right to use any of the images. Amazon makes no contention that it received any license to use the image on its websites. In short, the best information that we have – which Amazon appears to accept – is that this book was a "bootleg," start to finish, by a convicted pedophile and serial child-molester named Lawrence A. Stanley, currently in a Brazilian prison, and Amazon had absolutely no right to use the image in its internet advertising.

13

None of the cases that Amazon proffers in justification for its position have much bearing on the present issue. There was no consent for the use of the image in the product or for the promotional use of this image. It is clear that this image was the focal point of Amazon's advertising. That issue of the "focal point" is important. *See, e.g., Cummings v. Sony Music*, 2003 U.S. Dist. LEXIS 17394, *11 (S.D. N.Y. Sep. 30, 2003) (on CD packaging: "as in *Gritzke*, Sony made Plaintiff the focus of the compact disc's promotion by displaying his likeness on their packages. Accordingly, the Report rightly concluded that by placing Plaintiff's likeness on merchandise marketed by Defendant, without Plaintiff's permission, Defendant has publicly used Plaintiff's photograph for commercial purposes"); *Nottage v. American Express Co.*, 452 So. 2d 1066, 1068 (Fla. 3d DCA 1984) (Posters and postcards: "Plaintiff . . . found large posters advertising [real estate] wherein the Plaintiff's portrait was prominently incorporated and displayed as the focal point of the poster"). This case is a far cry from the facts of *Lane v. M.R.A. Holdings, LLC*, 242 F.Supp. 2d 1205 (M.D. Fla. 2002), cited by Amazon, where the Plaintiff had consented to the use of her topless image in a "Girls Gone Wild" video but then tried to contend that she had not consented to the use of her image in film clips advertising the video. The Court there held such use, if not consented to, was merely incidental in the advertising and not caught by the statute.

To the extent that *Lane* then suggests that the only use caught by the statute is when an image is used to promote a product other than one in which that person's image appears, it is flatly contrary to the view of the Northern District of Florida in *Gritzke*. *Lane* has moreover been dismissed as "anomalous" by the Northern District of Ohio in *Bosley v. WildWetT.com*, 310 F.Supp. 2d 914, 922 (N.D. Ohio 2004), as being contrary to the wealth of Florida authority on Fla. Stat. § 540.08, which that Court, correctly, considered to be the body of jurisprudence to

14

follow. *See, e.g., Gritzke v. M.R.A. Holdings, LLC*, 2003 U.S. Dist. LEXIS 9307, *4 (N.D. Fla. March 16, 2003); *Tyne v. Time Warner Entertainment Co.*, 204 F.Supp. 2d 1338 (M.D. Fla. 2002); *Loft v. Fuller*, 408 So. 2d 619 (Fla. 4th DCA 1982). Regardless, the subject of the image here, unlike in *Lane*, consented to neither the use of her image in the product nor in the advertisement, of which she was the focal point. To consider that *Lane* forbids the application of Fla. Stat. § 540.08 in such circumstances would be absurd.

We submit that the Court should therefore enter summary judgment in favor of the Plaintiff on Count I for liability.

### Count II – Civil Theft

Amazon accepts that the intellectual property right at issue here constitutes a "property" interest under Fla. Stat. § 540.08 – which since it is descendible [See Fla. Stat. § 540.08(4)] would seem clear. As such it may be the subject of theft and, thus, the subject of the Civil Remedy for Theft" or "Civil Theft" statute. Amazon also seems to concede, as it should, that its conduct in using the image constitutes the *actus reus* for theft. Amazon raises the sole objection that we cannot show by *clear and convincing evidence,* as we admit is required, that it had the requisite *mens rea* to commit theft, which we also admit is required.

We would first observe, parenthetically, that Amazon has made sure that the path to securing such "clear and convincing evidence" is as obstructed as possible, since it has objected to the production of virtually all the evidence sought by our interrogatories and document requests. (This is the subject of other pending and soon-to-be-pending motions). If it is not presently clear whether Amazon acted with the necessary intent, that issue should not be decided at a point in the case when the Defendant has stonewalled on all relevant discovery pertinent to the issue. Even so, we think that the requisite intent is already clear.

Amazon functions in an industry where photographic rights are key. Its own home state of Washington gives extensive rights to Plaintiffs in Ms. Cardoso's current situation, including the right to recover attorneys fees. Wash. Rev. Code § 63.60.060(5). Most of the other states in the U.S. have an analog of Florida's Statute, Fla. Stat. § 540.08, or common law causes of action, which afford similar relief. *See, e.g.*, Cal. Civ. Code § 3344 *et seq.* (2004); § 765 Ill. Comp. Stat. 1075/1 *et seq.* (2004); Ky. Rev. Stat. Ann. § 391.170 (2004); Mass. Ann. Laws ch. 214, § 3A (2004); Neb. Rev. Stat. § 20-202 (2004); Nev. Rev. Stat. § 597.770 et seq. (2004); N.Y. Civil Rights Law § 50 *et seq.* (2004); Ohio Rev. Code Ann. § 2741.01 *et seq.* 2004); Okla. Stat. tit. 12 § 1448 *et seq.* (2004); R.I. Gen. Laws § 9-1-28 *et seq.* (2004); Tenn. Code Ann. § 47-25-1101 *et seq.* (2004); Tex. Property Code § 26.001 *et seq.* (2004); Utah Code Ann. § 45-3-1 *et seq.* (2004); Va. Code § 8.01-40 (2004); Wash. Rev. Code § 63.60.010 *et seq.* (2004); Wis. Stat. § 895.50 (2004). Amazon is a huge company with squads of in-house lawyers and outside lawyers to whom intellectual property work is bread-and-butter. Amazon regularly sues people to protect its own I.P. rights and regularly gets sued for infringing on the I.P. rights of others. Amazon knows all about I.P. rights.

Amazon knows when it loads images of natural people onto its websites to advertise products, which it will then broadcast over the internet to all these jurisdictions, that it is on dangerous ground: people own the copyright in those images and the subjects may well have protectible interest in their likenesses. Amazon knows that if it does not have the required consents, it will be using property of other people, without their permission. The standard for website operators is to obtain the necessary evidence of consent. [See Hall Declaration, para. 55].

Yet Amazon consciously ignores this standard. *It loads up images by the hundreds and thousands, without doing anything to assure itself that it has any right whatsoever to use such images*. See Kirmayer Derclaration, para. 4 – 5. What is worse, it persists in this attitude, regardless of the sensitivity of the product area and the heightened need to take care, and regardless of who the publishers of the images are – even if they are serial child molesters, sitting in foreign jails! *It does not even try to find out who its publishers are.* This is not just below the accepted standard of care. It is plain reckless. See Hall Declaration, para. 66. In fact, if Amazon had taken a moment to consult the public record concerning Lawrence A. Stanley (as advocate or Defendant) and Ophelia Editions, it would – or should have exercised extreme caution. Just a few reported cases demonstrate this point. *See, e.g., United States v. Moore*, 215 F.3d 681 (7th Cir. 2000) (officer's discovery of magazine from Ophelia Editions provided probable cause basis for officer to believe that defendant possessed child pornography); *United States v. Knox*, 977 F.2d 815 (3d Cir. 1992) (Lawrence Stanley representing defendant in possession of child pornography case); *Stanley v. United States*, 932 F.Supp. 418 (E.D. N.Y. 1996) (Lawrence Stanley unsuccessfully defended a forfeiture action against child pornography in his possession); *United States v. Marcus & Stanley*, 807 F.Supp. 934 (E.D. N.Y. 1992) (Lawrence Stanley's unsuccessful motion to suppress child pornography in his possession found as result of search); *United States v. Knox*, 776 F.Supp. 174 (M.D. Pa. 1991) (air mail envelope from Ophelia Editions provided, in part, probable cause for search warrant for child pornography).

The *mens re* for theft is that the act be done "knowingly" i.e., with actual knowledge that the act is unauthorized. "Knowingly . . . means only the possession, actual or imported, of information concerning certain facts and does not require a specific intent to violate the law."

*Bartee v. Florida*, 401 So. 2d 890, 893 n.7 (Fla. 5th DCA 1981). Amazon says, in essence, that it cannot have the requisite intent to commit theft because its system is automated without any human involvement and the massive flow of intellectual property information means that no one at Amazon knows one way or the other whether Amazon has the legal right to use the images. This is not a tenable argument. It is no defense to a charge of theft that you are taking too many things to have to bother finding out if you have any right to take them! It is no defense to a charge of theft that you follow a business model whereby you consciously make no effort to find out whether you have permission to use people's property, and stop using it only when someone charges you with theft! "Reckless disregard" for the true state of affairs or done with the "conscious purpose to avoid learning the truth, constitutes "willful ignorance" or "willful blindness," and is the full equivalent of knowledge. *Hale v. Florida*, 838 So. 2d 1185, 1187 (Fla. 5th DCA 2003); *Hallman v. Florida*, 633 So. 2d 1116, 1117 (Fla. 3d DCA 1994); *Wetzler v. Florida*, 455 So. 2d 511, 513 (Fla. 1st DCA 1984).

Amazon's argument is basically that its size and preference to remain in ignorance exonerates it of any charge of theft. The answer to this "we are too big to bother" argument is that if a small website operator would make sure he had the necessary consents in place to comply with the law (which is the case – See Hall Declaration, para. 55), and would be reckless if he did not do so in a case such as the present (which is the case – See Hall Declaration, para. 66) then a big operator has to do the same. We do not change the rules to suit the Defendant's behavior; the Defendant needs to change his behavior to comply with the rules. If that means making a change in its business model, then that is what it has to do. As a matter of fact, it would be simple and cost nothing to implement such a change, on a completely automated basis. See Hall Declaration para. 65. However, for Amazon to run its business on its current model

demonstrates conscious, willful blindness, which is *the equivalent of intent under Florida law*. We submit that the Court should therefore enter summary judgment in favor of the Plaintiff on Count II for liability.

If the issue of intent is not, as yet, completely apparent, then it is already at least a jury question and it would be wrong for the Court to decide this point. At the least, the issue should not be summarily decided before we have taken sufficient discovery to ascertain the thinking that went into this business model and whether such "deniability" was, as we suspect, an intentional feature of the system, and otherwise to test the Defendants allegations. The fact is that as of now, Amazon refuses to give us any information relevant to this issue: indeed, it will not even tell us who supplied it with the image. [See Milne Declaration, para. 8, Exhibit "E"].

### Count III – Invasion of Privacy

The third count is for invasion of privacy at common law. "Under Florida law, the elements of common law invasion of privacy - commercial misappropriation of likeness coincide with the elements of unauthorized publication of name or likeness in violation of Fla. Stat. § 540.08." *Lane*, 242 F.Supp. 2d at 1220-21. As the elements for a violation of Fla. Stat. § 540.08 are clearly demonstrated by the facts of record as summarized in Statement of Facts, they require no further elaboration. We submit that the Court should therefore enter summary judgment in favor of the Plaintiff on Count III for liability.

### The "First Sale Doctrine" has no Application

Amazon's "First Sale" argument may be shortly dealt with. If we were dealing with a situation where Amazon was promoting the sale of remaining copies of Cabral's 1991 publication, as published by the original publisher, it would merit further discussion. But we are not. We are dealing with a much later "bootleg" version, which Amazon has adduced no

evidence to connect with Cabral, the original publisher or any other remotely arguable source of permission. The "first sale doctrine" just does not apply.

## Amazon's Liability to Disgorge Receipts Resulting
## from Advertising it Runs on its Associates' Websites

Amazon argues in Section E of its motion that it should have no liability for its Associates' use of the image in their advertising because they are separate, independent entities, over whose actions Amazon has no control.

This is not true. The Associates may be juridically separate entities but their actions are not independent of Amazon. In essence, they function as interactive cyber-billboards. They are authorized to link to and sell Amazon's products for as long as Amazon wants them to. They are Amazon's commissioned sales agents, whose actions Amazon has the right to control, and for whose actions Amazon is liable, just as any principal is liable for the actions of his agent. *See Pappas v. Smart Health U.S.A.*, 861 So. 2d 84, 85 (Fla. 4th DCA 2003) (recognizing the concept that liability would vest under Fla. Stat. § 540.08, under an agency theory, where it could be shown that the Defendant authorized the advertisement by another; summary judgment was granted in default of such evidence).

The fact is that only Amazon has the products and can sell the products. Amazon is therefore the sole ultimate source of the money. All the Associates do is run advertising for Amazon products on their sites. Amazon pays for successful sales resulting from that advertising by paying commissions. If Amazon does not like any aspect of what its Associate is doing, it can stop his commissions or even terminate him. If it likes what the Associate is doing, it will continue to pay for what he is doing. By contract, Amazon has the right to exercise total, effective control over the Associates sales activities and Amazon keeps the lion's share of the

money resulting from the Associates' activities.  Where there is such control and where there is such profit, liability must follow.

Otherwise, we confess that we do not understand the point made at the end of Section E of Amazon's argument that somehow the fact that other booksellers may also be illegally using the image to sell the product provides Amazon with a defense for doing so.

### There is a Causal Nexus Between The Use of the Plaintiff's Image And Income from the Sale of Products Other than Anjos Proibidos

Amazon argues that the only damages in this case should be measured by some function of Amazon's receipts in regard to Anjos Proibidos, itself.  To decide the issue of what damages are causally related to use of the image would be premature and particularly inappropriate to decide at this juncture, since much of the discovery which is the subject of Amazon's pending Motion for Protective Order was directed towards establishing just such a causal nexus.

However, it can already be demonstrated that the image was not just used to advertise the product itself.  The image was also used to assist in selling (a) other products such as books, DVDs and videotapes in the same genre; (b) other, wholly unrelated products; and (c) to promote Amazon's brand. As Mr. Hall, a marketing expert explains, this additional value is clearly demonstrated in Amazon's relationship with its Associates, since Amazon pays commissions to its Associates on sales of product resulting from click-throughs on images at its Associate's sites, regardless of whether that customer buys the particular product illustrated by that particular image at that Associate site.  See, Spillman Declaration, Exhibit "A;" Hall Declaration, paras. 48 - 51.  By this fact Amazon recognizes that (a) there is a causal relationship between attracting the customer through the display of an image advertising one product at an Associate's website

and the eventual sale of other product at Amazon and (b) Amazon regards the causal value as being at least equal to the amount of the commission that it pays. Hall Declaration, para. 52.

Otherwise, discovery is at too early a stage to prove total damages, which is why the Plaintiff's motion is directed to the issue of liability only.

### Conclusion

We respectfully suggest that Amazon's Motion for Summary Judgment should be denied in all regards and that the Plaintiff's Motion for Summary Judgment as to Liability be granted on all counts.

Respectfully submitted,

Aballi, Milne, Kalil & Escagedo, P.A.
2250 SunTrust International Center
One Southeast Third Avenue
Miami, Florida 33131
Ph: (305) 373-6600
Fax: (305) 373-7929

Hendrik G. Milne
Florida Bar No. 335886
Carlos F. Osorio
Florida Bar No. 597546

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was sent via FedEx to counsel for Amazon.com, Inc., Beth-Ann E. Krimsky, Esq., Ruden, McClosky, Smith, Shuster & Russell, P.A., P.O. Box 1900, 200 East Broward Boulevard, Ft. Lauderdale, FL 33302, and to David Goodnight, Esq. and Vanessa S. Power, Esq., Stoel Rives, LLP, 600 University Street, Suite 3600, Seattle, Washington 98101 this 20th day of July, 2004.

Hendrik G. Milne

22